THE PLANK'S TAVERN COMPANY (A CORPORATION) V. JOSEPH H. BURKHARD AND JULIUS F. BURKHARD.

*Corporations—Subscription to stock—Revocation.*

1. A subscription paper by which the subscribers "promise to pay the trustees of the hotel to be built at St. Joseph [their place of residence] the sums set opposite our names, to be taken as stock, $25 per share," is insufficient in and of itself to form a contract.

2. Two of said subscribers, upon being presented with a more formal paper, refused to sign it, and repudiated their existing subscription, after which a corporation was organized and the hotel erected with full knowledge of the refusal by said subscribers to pay their subscription, which the corporation sought to recover by suit. On the trial it was shown by parol testimony that the hotel was not such an one as was contemplated by the signers of the original subscription paper, and that it failed to meet in many particulars the representations made to the defendants to obtain their subscription. And it is held that the court properly directed a verdict in defendants' favor.

Error to Berrien. (O'Hara, J.) Argued June 4, 1891. Decided July 28, 1891.

*Assumpsit.* Plaintiff brings error. Affirmed. The facts are stated in the opinion.

*Lawrence C. Fyfe,* for appellant.

*C. B. Potter* (*Potter & Potter,* of counsel), for defendants.

Morse, J.  In the winter of 1888 and 1889 there was talk among the people of the village of St. Joseph about building a large hotel under the auspices of an incorporated hotel company.  This agitation was occasioned by the visit of John O. Plank to the village, who represented to its citizens that he would cause the erection in the village of a large summer hotel, with a capacity of entertaining 500 guests or more, said hotel to cost $150,000, in case the people of St. Joseph would subscribe $20,000, to be taken in stock in a corporation to be organized for the construction and operation of such a hotel.  An informal meeting of citizens was held, and at such meeting it was thought best by those present to accept Mr. Plank's proposition, and a committee was appointed to solicit subscriptions.  Neither of the defendants attended the meeting, and they testify that they had never heard of Mr. Plank at the time they subscribed the following paper, which was presented to them by the committee, and signed, as they claim, with reluctance, and upon the representation that the hotel was to cost $150,000:

" We, the undersigned citizens of St. Joseph, promise to pay the trustees of the hotel to be built at St. Joseph the sums set opposite our names, to be taken as stock, $25 per share."

This was signed by a large number of persons, and by the defendants as copartners, as follows: "Burkhard Bros., $200." Defendants also testified that they were told before signing that this paper was not binding.

"It was merely to see what they could do. They said they would be around with the binding list afterwards."

It seems that afterwards the committee did go around with a more formal paper, and, as fast as it was signed by those signing the first paper, their names were erased from the first subscription.   There was evidence on the part of the plaintiff tending to show that there was no abandonment of this first list, and that the second paper was drawn up for the purpose merely of getting all the subscribers on one paper, as several subscription lists had been circulated in the first place.   But there was testimony tending to show that this first paper was informal, and not meant as the final binding subscription, which is also corroborated by the erasures on the first list of the names of those signing the more formal subscription paper.   Unfortunately this last paper was not produced, nor was there any clear testimony as to its contents.   When this second paper came around, the defendants absolutely refused to sign it, and declined to pay anything towards the building of the hotel.   Subsequently to this refusal a corporation was formed called "The Plank's Tavern Company," for the purpose of building a hotel in the said village, with a capital stock stated in the articles of incorporation to be $250,000, and the number of shares to be 10,000, and the shares to be $25 each.   The stockholders in such corporation were five in number, as follows:

David Carter, Detroit, 480 shares.
Norman Beckley, Elkhart, Ind., 600 shares.
John O. Plank, Detroit, 8 shares.
John Bell, Benton Harbor, 8 shares.
John Highman, Jr., St. Joseph, 20 shares.

The office of the corporation was located at Detroit, Mich., and the articles of association were acknowledged by the said stockholders between the 22d day of April and the 4th day of May, 1889.   September 10, 1889, 8 shares of the stock of this corporation were made out to

the defendants, and soon thereafter tendered to them. They refused to receive the certificate. This suit was commenced in justice's court upon defendants' subscription, and judgment obtained by plaintiff. On appeal to the circuit court of Berrien county, the judge of that court directed a verdict for the defendants, giving his reasons at some length for so doing.

The hotel was built by this incorporated company, but its whole cost, including furniture and everything else necessary to equip the hotel for business, did not exceed $110,000, if it reached that figure. The directors of the company have mortgaged the hotel to John O. Plank for $60,000.

The theory of the plaintiff is that the hotel was built relying upon the promise of the defendants to pay their subscription, and it is argued that the case is ruled by *Peninsular Railway Co. v. Duncan,* 28 Mich. 130, and the late case of *International Fair & Exposition Ass'n v. Walker,* 83 Mich. 386. But we think there is a material difference between the case before us and either of the cases relied on by plaintiff's counsel. In the case against Duncan, he had signed a preliminary subscription paper, provided for and authorized by statute, as one of the original associates for the formation of a railway company, and signed a subscription agreeing to take a certain number of shares of the capital stock of the proposed company, and to pay therefor—

"At such times and in such sums as the same shall be assessed, demanded, and required to be paid by the directors of said company."

In the majority opinion, at page 138, it is said:

"In the present case it does not become necessary to discuss the question whether a party who expressly revokes his subscription before the corporation is formed can be compelled to pay it afterwards."

In the same opinion, at page 134, it is also said that the agreement must be mutual, and that there would be no difficulty at common law in enforcing the—

"Promises contained in an agreement of this general nature against the several promisors, where the object to be accomplished was lawful, where a beneficial purpose was in view, and where · it was possible to make to the several promisors the return which their subscriptions called for. In such cases the promises are mutual; acts are done and moneys expended in reliance upon the subscriptions; and the moment the promises are ⸀accepted by the organization and action of the corporation to which they are provisionally made, there can generally be no difficulty in their enforcement, if the corporation then has it in its power to give the stock subscribed for, and offers to do so."

In the present case the defendants expressly revoked their subscription' before the corporation was formed, and nothing could have been done in ̇reliance upon it; nor was there enough of the subscription paper to form a contract in and of itself. It was necessary for the plaintiff, in order to make a case upon it, to supplement and add to its terms by parol evidence. It was not as full and definite as either of the subscriptions in the two cases cited by plaintiff's counsel. Nor did the defendants here, as in Walker's case, attend any meeting of the subscribers, or take any part in forming or organizing the corporation. They did not stand by, as he did, and see the moneys being expended, the ground purchased, and the buildings erected, but, on the contrary, had nothing to do with the matter, and gave neither express nor silent assent. The corporators well knew when the company was organized and the moneys expended that defendants expressly repudiated the whole arrangement.

And there is nothing in the agreement connecting defendants' subscription with the plaintiff corporation. As was well said by the circuit judge, if, at the same

time that John O. Plank and his four associates were perfecting their organization, five or more of the subscribers to this subscription paper, living at St. Joseph, had, in good faith, executed other articles of association for the purpose of constructing a hotel in that village, it would not have been an easy matter to determine the identical corporation had in mind by the defendants when they signed the subscription paper. The identity had to be found by parol evidence, and, when we go into the realm of oral testimony to fix the liability of these defendants, we find, without serious dispute, that the hotel built by the plaintiff was not such a hotel as was contemplated by the signers to this paper, and that it failed to meet in many particulars the representations made to the defendants to obtain their signatures as copartners.

The circuit judge was right, and the judgment is affirmed, with costs.

The other Justices concurred.