MT. OLIVET CEMETERY ASS'N et al. v. SALT LAKE CITY et al.

No. 4119.  Decided April 13, 1925.  (235 P. 876.)

1. WATERS AND WATER COURSES—RIGHT APPURTENANT TO LAND LOST BY NONUSER FOR 30 YEARS. Lapse of 30 years, during which no beneficial use of water has been shown, forecloses claim of purchaser of land to use of any waters as appurtenant thereto.

2. WATERS AND WATER COURSES—EVIDENCE OF RIGHT BY EXCHANGE HELD TOO INDEFINITE. Evidence *held* too indefinite to establish claim of right to waters through exchange with appropriators.

3. WATERS AND WATER COURSES—CITY NOT INVESTED WITH PROPRIETARY RIGHT TO WATERS BY CONTROL, REGULATION, AND DISTRIBUTION UNDER POLICE POWER. A city, by mere exercise of its authority, in the nature of police power, under Comp. Laws 1888, § 1755, subd. 16; Comp. Laws 1917, § 570x17, to control and regulate water courses, and distribute the waters thereof to the persons having recognized rights thereto acquires no proprietary right to use of the water; beneficial use being the basis of right by appropriation to the use of water, Laws 1919, c. 67, § 3.

4. WATERS AND WATER COURSES—CEMETERY ASSOCIATION HELD TO HAVE ACQUIRED RIGHT BY DIVERSION AND USE. A cemetery association, by diverting from a creek and using for years for necessary and beneficial irrigation of its enlarged grounds sufficient water therefor without interruption or interference, and with intent to appropriate it, *held*, in the absence of a superior right, to have acquired a legal right to the water diverted and used, limited in quantity to its necessities.

5. WATERS AND WATER COURSES—AS BETWEEN CLAIMANTS, NEITHER OF WHOM HAS COMPLIED WITH STATUTE AS TO APPROPRIATION, ONE PRIOR IN TIME OF USE HAS SUPERIOR RIGHT. As between rival claimants to use of same water, neither of whom has complied with Laws 1903, c. 100, § 34 et seq., as to filing application to appropriate water with the state engineer, objection on account of such failure is not available, and the claim of the one prior in time of diversion and use is superior and prior in right.

6. WATERS AND WATER COURSES—RIGHT OF APPROPRIATOR LIMITED TO NECESSITIES. The extent of the right of an appropriator of water by diversion and use creates a legal right only to the quantity necessary for the use.

Appeal from District Court, Third District, Salt Lake County; *P. C. Evans*, Judge.

Action by the Mt. Olivet Cemetery Association and others against Salt Lake City and others. From the decree, plaintiffs appeal.

REVERSED AND REMANDED, with directions.

*Stephens, Brayton & Bagley* and *C. W. Morse*, all of Salt Lake City, for appellants.

*Wm. H. Folland*, City Atty., *Shirley P. Jones* and *W. A. Fraser*, Asst. City Attys., *Richards & Richards* and *Hurd & Hurd*, all of Salt Lake City, for respondents.

CHERRY, J.

In this action a decree was entered in the district court quieting the title to certain water rights in Emigration Canyon creek, from which the plaintiffs have appealed.

---

See Headnote 1.   40 Cyc. p. 727.
Headnote 2. 40 Cyc. p. 734.
Headnote 3.   40 Cyc. pp. 712, 766 (1926 Anno).
Headnote 4.   40 Cyc. pp. 701, 709.
Headnote 5.   40 Cyc. pp. 713, 722.

The appeal involves the rival claims of Mt. Olivet Cemetery Association and Salt Lake City, a municipal corporation, hereinafter to be referred to respectively as the cemetery association and the city. Other claims to the use of small quantities of the waters involved were asserted at the trial and confirmed by the decree. They are not challenged by either party to this appeal.

The controlling facts are not in dispute. The water flowing in Emigration Canyon creek at a point near where it issues from the mountains is divided by a wier, so that about one-third thereof is diverted through a channel in a southwesterly direction, and is claimed and used by persons not parties to this action; the remainder thereof is diverted into another channel, which runs in a westerly direction through the cemetery and to the city, and is the water to which the parties to this appeal assert the right to use. The average flow of the stream at the wier is about 5.46 cubic feet per second of time.

The water in dispute was appropriated and used at an early date (about 1860) by certain residents of the eastern part of Salt Lake City for the irrigation, through surface ditches, of their city lots. The cemetery was established in 1874 with an area of 20 acres, and thereafter water from the source in dispute was used for the irrigation of the cemetery grounds. For 35 years following, and until the year 1909, the water in controversy was used for the irrigation of the city lots referred to and the cemetery grounds; the cemetery being limited in quantity in times of scarcity to 4 miner's inches, or one-tenth of a cubic foot per second. By the year 1909, owing to the increase of population and growth of the city, the lots previously irrigated by surface ditches had been generally subdivided into smaller building sites and houses built on them; streets and sidewalks were graded and paved, and curbs and gutters were constructed, the result of which was to render the irrigation of the lots by the method and from the source formerly employed both undesirable and impractical. With a few minor exceptions the use of the water in dispute by the appropriators for the irrigation of the city lots referred to had, for the reasons stated, ceased in the year

1909. In the year 1909 the cemetery association obtained an additional and adjoining tract of land for burial purposes containing an area of 50 acres. This additional tract was at once improved and irrigated from the waters involved in this action. For the succeeding 8 years water from the source in controversy was used beneficially for the irrigation of the 70 acres of cemetery grounds without interference by any one.

In the year 1890 the city purchased three separate tracts of land situated in Emigration Canyon above the wier which divides the stream before referred to. Deeds to the city were made by the respective landowners conveying the land described and the water rights appurtenant thereto. No evidence was offered to show that any particular quantity of water had been used on or was appropriated to the lands conveyed, but it did appear that directly after the purchase of the canyon lands the city constructed a pipe line, diverting a considerable volume of water from a nearby spring tributary to the Emigration Canyon creek, and conducted the same to the city for municipal use. The right to the use of this water, however, is not involved in this action.

Some time between 1880 and 1883 the city constructed a canal, called the Salt Lake and Jordan Canal, in which water was conducted from Utah Lake to Salt Lake City. The canal intersected the area or section of city lots entitled to the use of the water from Emigration Canyon creek so that a portion of the city lots was under or below the canal. There was vague and indefinite evidence that thereafter a portion, but not all, of the lots lying below the canal was supplied with water by the city from the canal, and that the city, in exchange therefor, otherwise disposed of the water from Emigration Canyon creek to which such lower lots were entitled. The quantity of water involved in this exchange was not made to appear; nor was it shown to what uses the water disposed of by the city above the canal was applied. And no claim was made by virtue of any particular use of water pursuant to the exchange above the canal.

During a period of about 20 years from and after the year

1890 the city, through its officers and agents controlled, regulated, and distributed to and among the persons entitled thereto the water in controversy.

In the year 1917 the city undertook to lease all of the waters in dispute in excess of 4 miner's inches thereof to a ditch company who was a stranger to the title, and the threatened diversion thereof by such lessee provoked the commencement of this action.

The cemetery association asserted its right to the use of the water in dispute by virtue of its diversion and use thereof as hereinbefore stated. The foundation of the claim of the city, as stated in its brief, is as follows:

"First. The acquirement by purchase of certain lands with water appurtenant in Emigration Canyon.

"Second. By the exchange of the water when the city built the Salt Lake and Jordan Canal and furnished Utah Lake water to residents living west of the canal and utilized the Emigration Canyon water for the benefit of the residents living east of the canal, none of whom were the original appropriators; and

"Third. By reason of the city taking over the control, regulation, management, maintenance, and distribution of Emigration Canyon waters for and on behalf of the inhabitants of the city with the consent of the original appropriators and owners."

Upon substantially the foregoing facts the district court entered its decree by which, so far as the parties to this appeal are concerned, the cemetery association was awarded of the water in dispute the right to the use of 4 miner's inches, or one-tenth of a cubic foot per second of time, and the city was awarded the remainder, which rights, by the decree were quieted and confirmed.

The cemetery association, by this appeal, challenges the validity of the decree, and complains that the quantity of water decreed to it is much less than it is entitled to under the facts and law of the case; and that the right decreed to the city is unsupported by the evidence and is contrary to law.

The solution of the question involves an examination of the claims of the respective parties.

First, as to the claim of the city. As before seen, the city rests its claim upon (1) water rights appurtenant to land in

Emigration Canyon purchased by it in 1890; (2) by reason of exchanging Salt Lake and Jordan Canal water with prior appropriators of Emigration Canyon creek; and (3) by virtue of exercising control, regulation, and distribution.

It is important to observe here that the city does not claim to have ever used any of the water in question previous to the year 1917 for any corporate or municipal purpose; nor does the city prefer any claim to the use of water as trustee for the use and benefit of any particular person or persons. Its claim is in its own right as a municipal corporation.

The evidence is sufficient to indicate the fact that portions of the tracts of land in the canyon which the city purchased in 1890 had been previously irrigated, but the nature and extent of the use of the water thereon was not made to appear, except by the observations of a witness, made 30 years later, from which he estimated that a total of 75 acres had at some time been irrigated. Coincident with the purchase of the lands and appurtenant water rights by the city, the city constructed a pipe line, diverting from 1 to 3 cubic feet of water per second of time from a nearby spring and tributary of Emigration Canyon creek, which it has since continued to use for general municipal purposes. After its purchase of the canyon lands it does not appear that the lands were thereafter irrigated or that any claim or use of water has ever been made by the city or at all by virtue of the right previously appurtenant to the lands purchased, other than the water diverted through the pipe line. It is a fair inference that whatever right to the use of water passed to the city as appurtenant to the lands was thereafter used by the city through its pipe line. At any rate, there never was any other use made of it. The lapse of 30 years' time during which no beneficial use of water has been shown forecloses the claim of the city to the use of any waters as an appurtenance to the lands so purchased and owned by it.

The claim of water rights by virtue of the exchange referred to is also untenable. The evidence of the exchange was indefinite and unsatisfactory. It amounted to no more than that there were some exchanges made without indicat-

ing how many water users made exchanges or the quantity of water exchanged. There was no attempt ,to show that the exchange was intended to or did operate to exchange titles, or that any contract, conveyance, or grant was made transferring one right for the other. What exchanges were made amounted only to a temporary arrangement for mutual convenience, and did not, and could not, under the facts shown, transfer the title or right of each exchanging party to the other. But, again, the significant fact supervenes that from the year 1909 to 1917 no claim or use was ever made by the city, or at all, of water by virtue of such exchange. The claims of the city upon this ground must be denied.

The remaining and principal ground upon which the city relies in support of its claim is that by virtue of the fact that it had the legal power to, and did, control, regulate, and distribute the waters in controversy it thereby acquired for itself a right to the use of the same; not by virtue of any contract with, conveyance or grant from, the prior appropriators, but by virtue and operation of law.

The power exercised by the city was pursuant to statutory authority, which provides that the city shall have the power "to control the water and water courses leading to the city, and to regulate and control the water courses and mill privileges within the city; provided, that the control shall not be exercised to the injury of any rights already acquired by actual owners. * * * " Comp. Laws Utah 1888, § 1755, subd. 16; Comp. Laws Utah 1917, § 570x17. The statute itself expressly preserves from injury the rights of actual owners. Such rights are otherwise protected and preserved by fundamental and constitutional principles. The character and nature of the function or power intended to be conferred upon the city is further illustrated by the act passed in 1903 (Laws Utah 1903, c. 138, § 206, subd. 17), which adds to the provisions above quoted the following:

"And provided, further, that when the city council of any city is acting as distributing agent of the water, not the property of the corporation, outside of, or within, the corporate limits of such city, such council may, and is hereby authorized to levy such a tax

as may be necessary annually, not to exceed thirty cents per acre or share for the purpose of distributing, purchasing, or developing water, said tax shall be a lien upon such water right," etc.

The next Legislature, 1905, amended the act (so far as material here) to read as follows:

"To control the water and water courses leading to the city, and to regulate and control the water courses and mill privileges within the city; provided, that the control shall not be exercised to the injury of any rights already acquired by actual owners. And provided, further, that when the city council of any city, is acting as distributing agent of the water, not the property of the corporation, outside of, or within the corporate limits of such city, such council may, and is hereby authorized to levy such a tax as may be necessary annually, for the purpose of controlling, regulating and distributing such water and constructing and keeping in repair the necessary means for diverting, conveying and distributing the same; provided that the funds derived from the levy of said tax shall not be appropriated or used for any other purpose, and in the event that if more tax is levied and collected in any one year than is necessary for said purposes the excess thereof or balance shall be carried to the account of the year next following and applied to the purpose for which it was collected. Said tax shall be levied and collected as provided by ordinance, and until collected, the same shall be a lien upon such water rights and the land irrigated thereby." Laws Utah 1905, c. 42, § 206, subd. 17.

This statute, with the exception of an amendment (not material here) made in 1919, is still in force. Laws Utah 1919, c. 12. The authority conferred by the statute is clearly in the nature of a police power, and does not invest the city with any proprietary right to the use of such waters. The right to control and regulate is not the right to own or use.

The evidence of the control and regulation by the city was mainly to the effect that water masters appointed and paid by the city distributed the waters to and among the persons entitled to use the same, and, to a limited extent, patrolled and repaired ditches, etc. It is not claimed, and there is no evidence whatever to indicate, that the city asserted or exercised any proprietary right in itself to the use of the waters, or that it applied any of the waters to any use other than distributing it to the particular persons who had

recognized rights thereto. The waters were not distributed to the inhabitants of that portion of the city generally, or to persons selected by or claiming under the city, but solely to such particular persons who had individual and independent legal rights to the use of the water.

It is plain that the city merely exercised its police power and acted in the capacity of distributing agent for the owners of the water rights "not the property of the corporation." Such control and regulation are fatally lacking in the essential elements of the acts which constitute a legal appropriation of water. The cardinal rule of the doctrine of prior appropriation has always been, and now is, that "beneficial use shall be the basis, the measure, and the limit of all rights to the use of water in this state." Laws Utah 1919, c. 67, § 3. The acts performed by the city were not pursuant to any intent or purpose on its part to appropriate any of the waters to its own use, and no such use was ever made and none asserted until the year 1917, when it made the lease referred to.

It is clear that the mere regulation, control, and distribution of water by the city, under the facts in this case, do not form the basis of any legal rights to the ownership or use of such water.

The cases of *Springville* v. *Fullmer*, 7 Utah, 450, 27 P. 577; *Levy* v. *Salt Lake City*, 5 Utah, 302, 16 P. 598; *Holman* v. *Pleasant Grove*, 8 Utah, 78, 30 P. 72; *Fisher* v. *Bountiful*, 21 Utah, 29, 59 P. 520, are cited ·in support of the claim of the city. But they have no relevancy to the question under consideration. The cases cited deal exclusively with the question of the power of the city to exercise regulation and control, and its duties, and liabilities in connection therewith. In neither of the cases was any claim of paramount ownership of rights to the use of water by the city presented or considered.

It follows that the claim of the city to the use of any of the waters in controversy, based upon any appropriation or use prior to the year 1917, must fail.

Now, with respect to the claim of the cemetery association:

It clearly appears that previous to 1909 the cemetery was conceded a minimum of 4 miner's inches of water, and that from the year 1909 to 1917 the cemetery association actually diverted from the source in controversy and used for the necessary and beneficial irrigation of its enlarged grounds sufficient water for the purpose, without interruption or interference and with the intent to appropriate the same. In the absence of a superior right, the cemetery association thereby acquired a legal right to the water thus diverted and used, limited in quantity to its necessities.
In this action the only opposing claim is the claim of the city, which, as has been shown, is unfounded so far as any appropriation or use prior to the year 1917 is concerned.

Whether or not the failure of the original appropriators to use water on their city lots after 1909 amounted to a legal abandonment of their rights, and whether or not the cemetery association by the use made of the water from 1909 to 1917 acquired a title by adverse possession as against prior appropriators, are questions upon which able arguments have been made by respective counsel; but neither question may be appropriately considered here, because neither the prior appropriators nor any one connected with their title are parties to the action.

The claim of the cemetery association to rights initiated in 1909 and thereafter is challenged by the city upon the grounds that no application to appropriate water was filed with the state engineer and proceedings thereafter had, as provided by Laws Utah 1903, c. 100, § 34 et seq. It is not claimed that the cemetery association complied with the requirements of the statute quoted. Its right depends alone upon the actual diversion and use of the water, as heretofore stated.

On the other hand, the city has no right or title to the waters in question which originated earlier than 1917, and it did not file an application to appropriate water with the state engineer or otherwise comply with the requirements of the statute.

We thus have the situation of two rival claimants to the use of the same water, one of which is clearly prior to the

other in time of diversion and use, and neither of whom has complied with the formalities of the statute relating to appropriations. In Wiel on Water Rights (3d Ed.) § 411, it is said:

"The older statutes, based on the California Civil Code, were merely to regulate the doctrine of relation, while the new statutes described in this chapter are not limited to that purpose, and seem to aim at a comprehensive and exclusive method of appropriating. But it would seem necessarily, upon general principles of law, that between two parties, neither of whom has a permit, prior possession must prevail, at least until one or the other is approved by the state engineer."

See, also, Kinney on Irrigation and Water Rights (2d Ed.) § 1357.

Upon plain principles of reason and justice we conclude that as between the parties to this appeal the city may not object to the claim of the cemetery association for failure to comply with the statute when it is in precisely the same predicament with reference to its own claim. The claims of the parties must therefore be determined by the rule that as between appropriators the one first in time shall be first in right. The claim of the cemetery association is clearly prior in point of time and therefore superior and prior in right to the claim of the city, and the decree should have been entered accordingly.

The extent of the right of an appropriator is limited to his reasonable necessities. The diversion and use of water creates a legal right only to the quantity necessary for the use. In this case the evidence shows the area of the cemetery grounds to be 70 acres. A portion of it is in lawn grass, ornamental shrubbery and trees, and the remainder is in process of being similarly cultivated. Rows of trees have been set out around the exterior boundaries, and the whole area has been planted with crops and irrigated at times pursuant to the purpose of ornamenting and beautifying the whole area as a burial ground. We think the evidence warrants the conclusion that the appropriation of the cemetery association was for the irrigation of the entire area of 70 acres. There is a considerable opinion evi-

dence in the record upon the duty of water for irrigation of the cemetery grounds. The estimations of the witnesses of the area of such lands, irrigable by a cubic-foot of water per second of time, range from 55 to 90 acres. It is conceded that the irrigation of lawn grass, flowers, ornamental shrubbery, and trees such as grown in a cemetery requires a somewhat greater quantity of water than ordinary agricultural crops. Our conclusion from the whole evidence is that 1 cubic foot of water per second of time is reasonably necessary for the irrigation of the 70 acres of the cemetery grounds.

The decree appealed from is reversed, and the cause is remanded. The district court is directed to recast its findings of fact and conclusions of law to conform to this decision and to make and enter a decree adjudging the cemetery association to be the owner of the right to the use of 1 cubic foot per second of time of the waters in controversy (measured at the place of use) for the irrigation of its cemetery grounds, which right is superior and paramount to any right of the city, and that, secondary and subordinate to the right of the cemetery association, the right to use the remainder of the said waters be decreed to the city. Appellants to recover costs.

GIDEON, THURMAN, FRICK, and STRAUP, JJ., concur.