## FARRELL, Rec., v. SIMONS.

No. 27038. June 15, 1937.

Rehearing Denied Sept. 14, 1937.

Application for Leave to File Second Petition for Rehearing Denied Sept. 28, 1937.

A. L. Emery, for plaintiff in error.

Chas. B. McCrory and John H. Alsop, for defendant in error.

BAYLESS, V. C. J. D. P. Farrell, receiver of and for the Hamlin Motor Corporation, sued G. A. Simons in the district court of Okmulgee county, Okla., and appeals to this court from the judgment of the trial court sustaining a demurrer to his evidence.

Because of the manner in which the plaintiff embodied his cause of action in the petition, and because of the various theories which it presents, it is necessary to give a history of the entire transaction.

The Hamlin Motor Corporation was organized under the laws of Delaware, but was admitted to do business in Oklahoma, and intended to manufacture automobiles and trucks. It erected a manufacturing plant at Okmulgee, but being unable to pay for the same, the various lien claimants brought an action to foreclose their liens for material furnished and labor performed in the erection of this building, and Farrell was appointed receiver. The building sold for a sum insufficient to pay the lien claims, and under the orders of the district court the receiver instituted this action against Simons.

The petition alleged the organization of the corporation and its authority to do business in Oklahoma; that its president had an oral agreement with Simons that he would purchase at least $10,000 of the capital stock of the corporation, which $10,000 to be paid by him to the corporation for its stock was to be used to pay for the erection of the building; that in reliance upon this agreement the president of the corporation entered into a contract with Dickerson and Auman for the erection of the building and represented to them that Simons was putting $10,000 into the corporation and this would be used to pay them, and that the contractors relied upon this statement and upon their knowledge of Simons' financial ability to pay this amount; that the contractors began the erection of the building and bought material, employed labor, and sublet parts of the contract, and that the president of the corporation represented to the subcontractors that Simons was putting $10,000 into the corporation and that this was to be used to pay the contractors, who, in turn, could use this money to pay the subcontractors, and that the subcontractors relied upon this state-

ment and upon their knowledge of Simons' reliability to pay this amount; that during the course of the erection of the building the president of the corporation and Simons reduced their agreement for the purchase of the stock to writing (we will set out this contract later); that the contractors completed the building; that Simons failed, neglected, and refused to perform his contract to purchase said stock and did not pay any money to the corporation; and that as a result thereof the corporation was unable to pay the contractor, the contractors were unable to pay the subcontractors, and it was necessary to resort to receivership and foreclosure proceedings; and that the trial court specifically directed the receiver to sue Simons on behalf of the corporation and all others who had suffered from his failure to fulfill his contractual obligation to purchase the stock. The answer contained a general denial, a denial that Simons was a party to the foreclosure action, a specific denial that the corporation or its president were agents for him in reference to any of the matters mentioned in the petition, a plea of statute of limitations and a plea of the statute of frauds and an allegation that the alleged written agreement failed to satisfy the requirement of the statute of frauds.

A reading of the evidence of the plaintiff fails to disclose any evidence that Simons agreed to purchase this stock with the understanding that the money which he paid into the corporation would be used to build the building. The substance of the conversation between them was an inquiry on the part of Simons as to what the parties were figuring on doing, and the statement of the president of the corporation of the purposes in mind, such as getting a building erected and the production of some automobiles or trucks whereby it was hoped to interest other parties in Okmulgee, Tulsa, and elsewhere; and the statement of the president that it was his understanding that the money Simons put in would be used to erect the building. It is clear that nothing but conversations relating to the promotion of this corporation's business are embodied in the above, and it does not by any means appear that Simons had an understanding or that it agreed with that of the president of the corporation.

A reading of the evidence of the plaintiff likewise fails to disclose that Simons authorized the president of the corporation to make any representations to anyone concerning his obligation and thereby further obligate Simons. No one with whom the president of this corporation dealt ever went to Simons to ask him about the matter, and the president of the corporation does not say that he told the contractors and subcontractors that Simons had authorized him to make such statements.

If the cause of action is based upon deceit and fraud on the part of Simons, it must fall completely. The trial court clearly did not commit error in sustaining the demurrer to the evidence upon this phase of the case.

If the cause of action is treated as one to enforce a contract to subscribe to the capital stock of a corporation, it probably presents a more serious issue. We set out the written contract which was actually executed by the corporation and Simons:

"This agreement made and entered into this 26th day of September, 1928, by and between the Hamlin Motor Corporation, of Okmulgee, Oklahoma, as party of the first part, and George A. Simons, of Okmulgee, Oklahoma, as party of the second part,

"Witnesseth:

"That the party of the first part is desirous of maintaining office space for a period of one year in the Commerce Building, for its general offices at Okmulgee, Oklahoma.

"Now, therefore, for a consideration, receipt of which is hereby acknowledged, the party of the second part hereby agrees with the party of the first part for any space that the party of the first part should require during the above mentioned period, and the party of the second part agrees to take one-half (½) consideration in cash, and the remaining one-half (½) in the capital stock of the Hamlin Motor Corporation, at $25.00 per share.

"For a further consideration the party of the second part agrees to purchase a reasonable amount of capital stock from the party of the first part at $25.00 per share on or before October 1, 1928."

The defendant never paid the corporation any money for any stock. Obviously he could not become an active director of the corporation from and after the 26th day of September, until he actually owned some stock in the corporation. The testimony of the president is that some shares of stock were written out in Simons' name, but never delivered to him. The president of the corporation was permitted to testify, over the objection of the defendant, as to the wording of the last paragraph of the contract above quoted. The substance of the testi-

mony of the president of the corporation is that he and Simons met for the purpose of reducing the agreement to purchase to writing, and that when they came to write that part of the agreement relating to the amount of stock to be purchased, Simons would not agree to specify any particular amount, saying that he would buy $10,000 worth, but if he made certain collections he would buy five or ten thousand more. Simons refused to permit this to be stated in the written agreement, and insisted that the phrase "reasonable amount" be used. In our opinion this testimony was wholly inadmissible, for the reasons hereinafter set out.

There is a division of authority as to whether a subscription to the capital stock of a corporation is within the statute of frauds. Plaintiff cites and relies upon the text of Fletcher's Cyc. Private Corporations, vol. 2, page 181, sec. 537, to the effect that it is not. Plaintiff also cites and relies upon 14 C. J. 520, sec. 776, and 25 R. C. L. 617, sec. 231. The text quoted from Fletcher's work, supra, lays down such a rule of law without qualification, as does 14 C. J. supra. But 25 R. C. L., supra, states there are cases to the contrary; and it is significant to notice that Fletcher's Cyc. of Corps. (Permanent Edition) vol. 4, page 152, sec. 1481, departs from the unqualified rule of his earlier edition and states there are cases to the contrary, and in 27 C. J. 238, sec. 264, it is recognized there are two lines of authorities. See, also, 14 A. L. R. 400-401, and 59 A. L. R. 598.

The cases adhering to the rule contended for by the plaintiff generally are earlier cases, whereas most of the cases holding to the contrary are of more recent date. The older cases pretend to see a difference between a subscription to unissued capital stock and a contract by the corporation for the sale of its issued stock bought back and held in the treasury or a contract between individuals for the sale of issued capital stock. These cases are coeval with the older cases holding that any contract relating to the sale of the shares of capital stock was without the statute of frauds, which rule is now almost wholly departed from in the modern cases. We feel that the tendency of the modern cases to depart from the unqualified rule announced by Fletcher in his earlier edition is a further manifestation of the changing viewpoint of the courts toward the nature of capital stock as property.

Obviously the decisions of those states where by statute the subscription of capital stock is surrounded by certain formalities cannot affect this question. New York state is one such.

Usually the text-writers and the courts, which say that subscription of unissued capital stock differs from a contract of sale of issued capital stock, will follow such a statement by the statement that such contracts are governed by the same general rules of law. In support of this we call attention to Fletcher's Cyc. of Corps. (Permanent Edition) vol. 4, page 27, sec. 1372:

"A subscription for stock is to be distinguished from a contract to purchase stock from a corporation, and the two are to some extent governed by different rules. Ordinarily, however, the governing rules are the same, regardless of whether the agreement between the corporation and the intending stockholder is considered a subscription to stock or a contract of sale; and in this chapter the rules governing sales of stock by the corporation are included as a part of the rules governing subscriptions, without distinguishing them from the latter except where the governing rules are different."

And section 1401, on page 60:

"A contract of subscription for stock in a corporation, when binding, is a contract between the subscriber or subscribers and the corporation, and its formation and validity are governed by the same principles, substantially, as any other contract, except in so far as such principles may be rendered inapplicable by particular charter or statutory provisions."

And section 1417, on page 76:

"Strictly speaking, an incomplete subscription is no subscription at all. In order that there may be a binding subscription, the parties must, as in the case of other contracts, have reached a complete agreement. If anything remains to be agreed upon or done, there is no contract."

We do not believe there is a rational difference between the two contracts—that is, the subscription of the capital stock before issue and the sale thereof after issue —in the light of the statute of frauds. We choose to follow the rule that such a subscription is within the statute. See Hewson v. Peterman Mfg. Co., 76 Wash. 600, 136 P. 1158, 51 L. R. A. (N. S.) 398, Ann. Cas. 1915D, 346; Weston v. Dahl, 162 Wis. 32, 155 N. W. 949; Spencer v. McGuffin, 190 Ind. 308, 130 N. E. 407; Mayhaw Canning & Pres. Co. v. Cohen, 135 Miss. 378, 99 So. 896; Shadbolt & Boyd Iron Co. v. Long, 172 Wis. 591, 179 N. W. 785 (holding that an oral subscription accompanied

by a part payment is without the statute); Farm Lands Dev. Co. v. Taft, 194 Iowa, 481, 186 N. W. 431, and Jackson v. Sabie, 36 N. D. 49, 161 N. W. 722.

In thus deciding we are adhering to an earlier opinion of this court, Hays Drilling Co. v. Sartain, 108 Okla. 181, 235 P. 876. The plaintiff cites and relies on this case as supporting his contention. We do not understand that case to so hold, but to hold to the contrary. The issue arose in that case in an awkward manner, but the decision of this court thereon is unmistakable. Sartain sued the oil company for $1,495 for services rendered, for which a lien was claimed. The oil company answered by admitting the contracts for the services, but alleged that Sartain had agreed to receive $1,000 of the capital stock of the company to be issued to him by the company. Sartain admitted this agreement, but asserted it was unenforceable because it was in effect a subscription for capital stock and within the statute of frauds. We held that, since the agreement had been made, and Sartain had fully performed, and the company had offered to perform and was yet willing to perform by issuing the capital stock, Sartain could not sue on part and repudiate part, and that the particular contract would be enforced, as this court would not make a new contract for the parties by allowing the plaintiff to have money instead of the stock. But there is no mistaking the language of this court relating to the enforceability of such a contract under other circumstances. We said:

"There can be no question but that the alleged oral agreement was not clothed with the sanctity of an enforceable contract, and that the plaintiff at his option, without suffering peril, could either carry it out or disregard it."

The general rule relating to the sufficiency of a memorandum within the statute of frauds is as stated by this court in Griffin Groc. Co. v. Kingfisher Mill & Elevator Co., 168 Okla. 157, 32 P. (2d) 63, as follows:

"A memorandum to be sufficient under the statute of frauds must be complete in itself and leave nothing to rest in parol, and where the parties have left an essential part of the agreement for future determination it is no doubt correct to say that the contract is not completed."

See Mason Motors Spirit Distributing Co. v. Cosden, 105 Okla. 244, 231 P. 890, and 6 R. C. L. 643.

The case of Planks Tavern Co. v. Burkhard, 87 Mich. 182, 49 N. W. 562, is a case very much in point. There certain parties signed a subscription agreement reading in part as follows:

"We, the undersigned citizens of St. Joseph, promise to pay the trustees of the hotel to be built at St. Joseph the sum set opposite our names, to be taken as stock, $25.00 per share."

The Supreme Court of Michigan, in discussing the evidence, said in part:

"It was necessary for the plaintiff, in order to make a case upon it, to supplement and add to its terms by parol evidence. It was not as full and definite as either of the subscription cases cited by plaintiff council. * * * And there is nothing in the agreement connecting defendants' subscription with the plaintiff corporation. As was well said by the circuit judge, that if, at the same time that John O. Plank and his four associates were perfecting their organization, five or more of the subscribers to this subscription paper, living at St. Joseph, had, in good faith, executed other articles of association for the purpose of constructing an hotel in that village, it would not have been an easy matter to have determined the identical corporation had in mind by the defendants when they signed the subscription paper. The identity had to be found by parol evidence, and, when we go into the realm of oral testimony to fix the liability of these defendants, we find, without serious dispute, that the hotel built by the plaintiff was not such an hotel as was contemplated by the signers to this paper, and that it failed to meet in many particulars the representations made to the defendants to obtain their signatures as copartners."

The case just quoted from well illustrates the difficulties which might well face parties were they to be permitted to resort to parol evidence to complete an agreement, or leave some part of the agreement incomplete and to be agreed upon in the future. It certainly is no more ambiguous or uncertain than this case.

In the case before us, the oral negotiations were definite as to the amount of stock to be subscribed. It is obvious from the authorities cited above that this parol agreement was a nullity. When the parties later met to make an agreement in writing, Simons positively refused to set a definite amount. He refused to agree to let the agreement read: "* * * $10,000, and if his deal went through, then he could buy more." He insisted that the agreement read: "reasonable amount," and if his expectations were justified, "* * * he could buy more." Therefore, the agreement was

incomplete. It depended upon contingency. If thereafter the parties could not agree, parol evidence would be necessary to show whether the contingency occurred and what would be a "reasonable amount" under all of the circumstances. We hold the agreement unenforceable, and that the trial court correctly sustained a demurrer to the evidence of the plaintiff.

Judgment affirmed.

OSBORN, C. J., and PHELPS, CORN, and GIBSON, JJ., concur.