JOSEPH E. SEAGRAM & SONS, INC.,
Appellant,

v.

Dan W. SHAFFER, Appellee.

No. 6960.

United States Court of Appeals
Tenth Circuit.

Oct. 25, 1962.

Rehearing Denied Dec. 10, 1962.

Before MURRAH, Chief Judge, and PICKETT and HILL, Circuit Judges.

HILL, Circuit Judge.

This diversity action is here on appeal from a judgment rendered by the court below, sitting without a jury, in favor of appellee, Dan W. Shaffer, on his counterclaim against appellant, Joseph E. Seagram & Sons, Inc., for breach of an alleged oral contract entitling him to purchase a certain amount of corporate stock.

Joseph E. Seagram & Sons, Inc., is the successor corporation to Riceland Corporation (hereafter referred to as Riceland). In 1954 the Bronfman family [1] of Montreal, Canada, owned 99% of the outstanding shares of common stock in Riceland.[2] The remaining 1% of issued stock was owned by M. R. Shaffer, a cousin of appellee, who was employed by the Bronfmans as a consultant on their investments in the oil and gas industry, and who was vice president of the Frankfort Oil Company (hereafter referred to as Frankfort), one of the many Bronfman family owned corporations.

At the beginning of 1954, Riceland was inactive, had practically no assets and had a large deficit on its books. At this time M. R. Shaffer was directed by the Bronfmans to determine the feasibility of reviving Riceland for the purpose of engaging in the business of drilling oil and gas wells. As a result, the Bronfmans decided to reactivate Riceland and asked M. R. Shaffer to find a suitable person to manage the revived corporation. To that end M. R. Shaffer contacted appellee early in 1954 and inquired if appellee was interested in the position with Riceland. Appellee was then employed as assistant drilling superintendent by a drilling company located in Tulsa, Oklahoma, but nevertheless indicated

T. Murray Robinson, Oklahoma City, Okl., and William A. Jansen, New York City (Mathias F. Correa, New York City, Robinson, Robertson & Barnes, Oklahoma City, Okl., John W. Nields, and Cahill, Gordon, Reindel & Ohl, New York City, on the brief), for appellant.

John A. Johnson, Oklahoma City, Okl. (Houston Bus Hill and Savage, Gibson, Benefield & Shelton, Oklahoma City, Okl., on the brief), for appellee.

1. The Bronfman family was represented, in matters relevant to this case, by Edgar Bronfman, then a resident of Canada but now a resident of New York and the President of appellant corporation.

2. Riceland was authorized by its charter to issue 150,000 shares of common stock but in 1954 only 79,699 shares had been issued. It also had issued some shares of preferred stock but these are not material to this case.

that he was interested in the job. His name was ultimately submitted to the Bronfmans with M. R. Shaffer's recommendation, in the form of a written memorandum dated February 22, 1954, that he be employed to take charge of Riceland's day to day drilling operations at a salary of $12,000 per year plus an expense account and automobile. M. R. Shaffer also stated in the memorandum:

"Dan Shaffer [appellee] should acquire, and I would like to approve common stock holdings in Riceland."

Riceland was revived, appellee's employment was approved by the Bronfmans as recommended by M. R. Shaffer and he commenced work on April 16, 1954, taking charge of the drilling operations.

It is undisputed that some seven months after appellee's employment commenced, Riceland loaned him $10,000 to purchase a home.[3] It is also undisputed that the subject of allowing appellee to acquire common stock holdings in Riceland was discussed at the time he accepted the position with Riceland, but no agreement was reached at that time concerning the stock purchase.

M. R. Shaffer testified that in May, 1954, he informed appellee that a 30% stock option for him had been accepted and approved or agreed to by the Bronfmans. Appellee then replied that this was acceptable to him. In this respect, M. R. Shaffer further testified at the trial, that as a result of the reviving of Riceland he made a survey to determine an equitable participation in corporation stock between the financiers and operators of it; that he prepared and submitted a written memorandum or "notegram" to the Bronfmans wherein he recommended a 60–40 participation with the Bronfmans retaining 60% of the common stock, he, M. R. Shaffer, would increase his holdings from 1% to 10%, and appellee would have 30%; that prior to the time he advised appellee of the 30% stock purchase contract this memorandum was discussed with the Bronfmans, who acted favorably upon and agreed to his recommendations; and that he was authorized by them to contact appellee and see if the 30% was agreeable, which he did, and reported back to Edgar Bronfman that the deal was made with appellee on that basis. This memorandum was not produced at the trial, but, M. R. Shaffer was permitted, over objection, to testify about it. He also testified that there was no discussion about when the "option" was to be exercised and there was no discussion or agreement as to where the stock was going to come from, i. e., whether from oustanding stock or unissued stock. Nor was there anything in writing from either the Bronfmans or Riceland to appellee defining the terms of such alleged agreement. In this connection Edgar Bronfman testified he had never discussed a 30% stock participation plan for appellee with M. R. Shaffer, appellee, or anyone else and the figure of 30% was never mentioned until appellee asserted his claim for that amount in 1957.

On July 8, 1954, appellee officially became President and a director of Riceland. Almost a year later on April 6, 1955, and without any further action having been taken with regard to the alleged oral contract in question, Edgar Bronfman wrote to appellee advising him that his salary had been raised to $17,000 per year, retroactive to January 1, 1955, and stating:

"Common stock participations by yourself and Mr. Hicks are under advisement and, when the details have been examined, I should like to discuss this with you." [4]

---

3. Appellee's refusal to repay the balance due on the loan was the basis of this action as originally instituted by appellant, and it recovered judgment in the sum of $8,133.28 plus interest against appellee on its complaint. This portion of the judgment below is not questioned here.

4. It appears from the record that appellee had made a separate agreement with Hicks whereby he would relinquish 10% of his alleged 30% to Hicks as an inducement for Hicks' employment.

On June 2, 1955, E. A. Bratton, an accountant for the Bronfmans and Vice President and Treasurer of Riceland wrote to appellee as follows:

"Dear Dan:

Re: Shareholding Interests.

"This will confirm the shareholding participations in the outstanding common stock of Riceland Corporation for yourself and Orville W. Hicks as follows:

| | | | |
|---|---|---|---|
| Dan W. Shaffer | 5% | 4,242 | shares |
| Orville W. Hicks | 2% | 1,696 | " |
| Other Shareholders | 93% | 78,900 | " |
| | 100% | 84,838 | " |

"The cost of the shares will be $1.00 a share, with terms of payment to be arranged.

"It is also understood that the 799 shares owned by Mr. M. R. Shaffer will form part of your common stock participation and that Mr. M. R. Shaffer will be reimbursed $799.00 representing his cost.

"A directors' meeting will be required to formally confirm your stock participation. I suggest, however, that this meeting be deferred for the time being." [5]

Appellee tstified that he interpreted this letter as meaning the 5% to him and the 2% to Hicks represented a partial draw down against his 30% participation and that, upon receiving it, he immediately called M. R. Shaffer who suggested he telephone Bratton, which he did, informing Bratton of his interpretation and was advised by Bratton "to hold off on doing anything and he would be told later how the whole matter would be handled." [6]

Four days later and on June 6, 1955, Bratton wrote to M. R. Shaffer, as follows:

"Dear Ray: With further reference to the shares of Riceland owned by you, it has been the understanding that they will be purchased by Dan Shaffer. I am told that this should be done immediately, even before Dan takes down the balance of his share option. The cost for your shares is $1.00 a share of $799.00 total.

"Will you please undertake with Dan to transfer the shares as soon as you can?" [7]

On the same day, Bratton wrote to appellee, enclosing a copy of the letter to M. R. Shaffer, and stating:

"Dear Dan: Attached is copy of letter to Ray in connection with the purchase by you of his 799 shares of Riceland.

"There is one point, Dan—if you wish to defer purchase until you get your full participation or for personal reasons you do not wish to take down the shares now, an alternative method would be for Riceland to redeem the shares; they would then be included in your total participation when issued later.

"Whichever way you decide is satisfactory to the other directors, Dan, but you might let me know what you decide." [8]

In late 1955, all of the outstanding stock of Riceland was sold to The Huntington Creek Corporation, one of appellant's wholly owned subsidiaries. This transfer was effective as of June 30, 1955, and the Huntington Creek corpo-

---

5. It is conceded in the record that no action was ever taken by Riceland's directors with respect to any stock option in favor of appellee, despite the existence of this and other correspondence hereafter discussed.

6. In this connection M. R. Shaffer testified about the letter as follows:
"This would be a draw down of stock totaling 7 per cent, and would have to

have been—or authorized by the stockholders of Riceland."

7. This transaction concededly never occurred.

8. Edgar Bronfman testified that he "assumed" the three letters were discussed with him before they were written and did not deny he authorized Bratton to write them.

rate minutes reflect that 79,699 shares of Riceland's common stock, having a par value of $1.00 per share, were purchased by it for $.79 per share. Appellee testified M. R. Shaffer informed him that a decision had been made to satisfy his stock participation by some other means, namely, an option on appellant's stock for equal value since Riceland's stock had been sold to Huntington Creek but that this would be worked out with him.

Appellee further testified that in December, 1955, he was in New York City on business for the company; that the subject of his stock participation was to be discussed but Edgar Bronfman was unable to attend this meeting so no such discussion was had; that he called Bronfman in Montreal from New York City and Bronfman requested the stock purchase discussion be deferred, but assured him the matter would be worked out later.

The record shows nothing further was done about the "option" for over a year until shortly before appellee was removed from his position as President and Director of Riceland on January 22, 1957. It is not disputed that on January 2, 1957, and, after appellee had learned of the probable termination of his employment, he submitted a written offer to purchase Riceland based upon an actual valuation of $3.27 a share for the stock and that his offer included the relinquishment of any consideration due on his stock participation plan. Appellee's offer was rejected and he then orally attempted to exercise his alleged 30% stock option at the time he was removed from office.

On February 13, 1957,[9] appellee wrote to Edgar Bronfman asserting his alleged 30% stock option and requesting that shares of common stock of that amount be delivered to him. On February 15, 1957, Edgar Bronfman wrote to appellee denying that appellee had ever had a "stock option agreement" and stating that when Huntington Creek purchased Riceland's stock "I told you that any discussions we had had about a stock participation were obsolete, as the situation had radically altered." This is apparently a reference to the decline of Riceland's drilling operations in 1956 which ultimately led to appellee's dismissal from Riceland.

About four months later, Riceland demanded payment of the loan it had made to appellee, which was refused. Appellee then asserted that under the terms of his employment he was to have a stock participation of 30% of Riceland's common stock and he was willing to let the unpaid balance of the note apply against the stock settlement.

Thereafter, and as of July 31, 1957, Huntington Creek transferred all of Riceland's outstanding stock to appellant and Riceland was later dissolved. All of its assets were distributed to appellant.

Upon this and other evidence hereafter discussed, the trial court resolved all issues of fact and law in favor of appellee on his counterclaim and specifically found: An oral contract was made between appellee and Edgar Bronfman, through M. R. Shaffer, which was binding upon the Bronfmans, Riceland, Huntington Creek and appellant, under the terms of which an option to purchase 30% of the outstanding common stock of Riceland became vested in appellee and such agreement was made, not as a part of his employment agreement, but in 1954 after he had accepted and commenced such employment; appellee was to receive a valid written and enforceable option to buy 30% of such stock for $1.00 per share, exercisable at any time and as to all or any part of 30% of the stock; the oral contract was supported by executed consideration in the form of services rendered and then being rendered to the Bronfmans and Rice-

9. He apparently wrote an earlier letter on February 6, 1957, which was unintentionally unsigned and in which he stated that the "option" was a "substantial part of the inducement to me to assume the presidency of Riceland."

land;[10] the stock option was evidenced by the unfound memorandum or "notegram" prepared by M. R. Shaffer and the letters signed by Riceland's officer and agent, Bratton, dated June 2 and 6, 1955; the delivery of such letters constituted partial performance by the Bronfman family and Riceland; appellee had a reasonable time within which to exercise such option and he did so within that time; at the time the oral contract was breached the value of the common stock was $3.27 per share; and appellee was entitled to a transfer of 25,450 shares of the then issued and outstanding aggregate of 84,834 shares. The court, after crediting $1.00 per share thereon, rendered judgment for appellee on the basis of common stock of an aggregate value of $57,771.50. Appellant perfected this appeal from that judgment, contending that the claimed oral agreement is invalid and unenforceable under the Oklahoma Statute of Frauds.[11]

The object of the statute of frauds is to prevent fraud and perjury in the enforcement of obligations, depending for their evidencing support on the unassisted memory of witnesses, by requiring certain designated contracts and transactions to be evidenced by a writing signed by the party to be charged and not for the purpose of promoting frauds or aiding an individual in the perpetration of a fraud. Wells v. Shriver, 81 Okl. 108, 197 P. 460; 37 C.J.S. Frauds, Statute of § 1, p. 513. It does not prohibit the making of such contracts but only affects and prohibits the enforcement thereof. Bond v. Chalfant, 201 Okl. 600, 208 P.2d 535; Teel v. Harlan, 199 Okl. 268, 185 P.2d 695.

In Oklahoma, the statute of frauds clearly applies to a contract for the purchase and sale of corporate stock. Farrell v. Simons, 180 Okl. 600, 71 P.2d 688; Dennison v. Hildt, 180 Okl. 399, 70 P.2d 56, 112 A.L.R. 486. Such a contract is, therefore, invalid and unenforceable under subsection 4 of § 136 unless one of the following requirements is met: (1) "the buyer accept or receive part of such goods and chattels, or the evidences or some of them, of such things in action"; or (2) "the same, or some note or memorandum thereof, be in writing and subscribed by the party to be charged, or by his agent"; or (3) the buyer "pay at the same time some part of the purchase money."

There is no question presented here with respect to the first requirement since the appellee, as the buyer under the alleged oral agreement or "option" clearly did not receive or accept any part of the corporate stock, or any evidence thereof, alleged to be covered by such agreement. The court below did, however, find that the material terms of the claimed oral agreement were reflected in the written memorandum or "notegram" prepared by M. R. Shaffer and submitted to the Bronfmans and the three letters written by Bratton in June, 1955,[12] and

---

10. The court found and held that the Bronfmans so dominated and controlled Riceland that it did not exist as a separate corporate entity.

11. 15 Okl.St.Ann. § 136, provides in pertinent part as follows:
   "The following contracts are invalid, unless the same, or some note or memorandum thereof, be in writing and subscribed by the party to be charged, or by his agent:
   "1. An agreement that, by its terms, is not to be performed within a year from the making thereof.
         *    *    *    *    *
   "4. An agreement for the sale of goods, chattels, or things in action, at a price not less than fifty dollars, unless the buyer accept or receive part of such goods and chattels, or the evidences or some of them, of such things in action, or pay at the same time some part of the purchase money; * * *."

12. Finding No. 17 reads as follows:
   "During 1955, M. R. Shaffer, as duly authorized agent and representative of the Bronfmans and the Riceland Corporation, prepared, signed and submitted a notegram or memorandum specifying a total common stock participation by defendant of thirty per cent of the issued and outstanding common stock of the Riceland Corporation, which, considered with the letters of June 1955 previously mentioned, constituted definite, complete, connected memoranda constituting an en-

that, in any event, the claimed oral agreement was partly performed by both parties.[13] The court then concluded that the enforceability of the claimed oral agreement was not barred by the Oklahoma Statute of Frauds.

The well-established rule is that a complete contract, whether it relates to a sale of real estate or a sale of goods, which is binding under the statute of frauds may be entered into by one or more letters, telegrams or other writings between the parties relative to the subject matter of the contract if they are so connected with each other that they may be fairly said to constitute one paper relating to the contract. However, in order to be sufficient the writings relied upon must by reference to each other disclose every material part of a valid contract and must be signed by the party sought to be charged or by his agent. The memoranda or writings must plainly set forth the parties to the contract, the subject matter thereof, the price or consideration, a description of the property, and all of the terms and conditions of the contract, and must leave nothing to rest in parol. Irvine v. Haniotis, 208 Okl. 1, 252 P.2d 470; Hawkins v. Wright, 204 Okl. 55, 226 P.2d 957; Jennings v. New York Petroleum Royalty Corp., 169 Okl. 528, 43 P.2d 762; Mason Motors Spirit Distributing Co. v. Cosden, 105 Okl. 244, 231 P. 890; Atwood v. Rose, 32 Okl. 355, 122 P. 929; Halsell v. Renfrow, 14 Okl. 674, 78 P. 118, aff'd 202 U.S. 287, 26 S.Ct. 610, 50 L.Ed. 1032. Parol evidence cannot be permitted to supply an omission of any essential element of the contract. Halsell v. Renfrow, supra. The design of the statute is to have written evidence of the terms thereof and any missing link which requires resort to oral evidence to connect or establish the agreement is fatal. Dennison v. Hildt, supra. And there must be no substantial inconsistency between a signed document and another document incorporated in it by reference or relied upon to establish any of the material terms of the contract. 37 C.J.S. Statute of Frauds § 178, p. 661.

The memoranda or writings required by the statute must show an existing and binding contract, a concluded agreement, a meeting of the minds of the parties as distinguished from mere negotiations. It is an incomplete contract where the parties have left an essential part of the agreement for future determination. Farrell v. Simons, supra; Griffin Grocery Co. v. Kingfisher Mill & Elevator Co., 168 Okl. 157, 32 P.2d 63; American Natl. Bank of Oklahoma City v. Ardmoreite Pub. Co., 123 Okl. 225, 253 P. 81, 37 C.J.S. Statute of Frauds § 180, p. 663. If the memoranda or writings are afterwards lost or destroyed, the contents thereof may be

forceable written stock option to the extent of thirty per cent of the issued and outstanding shares of common stock of the Riceland Corporation, the three letters of June, 1955, recognizing that defendant's 'full' or 'total' participation was greater than the eight per cent thereby extended to him."

13. Findings Nos. 6 and 9 read as follows: "On June 2nd and 6th, 1955, the Bronfmans and Riceland Corporation partially performed said previous oral agreement by delivering three letters, signed by an officer of the Riceland Corporation and an employee of the Bronfmans, duly authorized to so execute and deliver said letters, which constituted a valid and enforceable written option in defendant to purchase eight per cent of the total common corporate stock of the Riceland Corporation then issued and outstanding. Said instrument was accepted by defendant, who was then prepared, able and willing to execute said option, furnished in partial performance of the prior agreement, but exercise thereof was deferred at the request of the Bronfmans and the Riceland Corporation."

"Defendant fully performed his part of the option agreement to the date of his discharge, and was willing to continue such performance, and the services so rendered were unique and highly successful, and constituted the basic and primary consideration for the stock option and for exercise thereof, the one dollar per share payable upon exercise thereof being a subordinate consideration which the Bronfmans and the Riceland Corporation declined to accept, although offered."

proved by oral testimony after a proper foundation has been laid. 49 Am.Jur., Statute of Frauds, § 315, p. 630; 2 Corbin on Contracts, § 529, p. 790.

The question of whether the memoranda, letters or other writings relied upon are sufficient to constitute a contract or agreement which meets the requirements of the statute is one for the court to determine as a matter of law. Atwood v. Rose, supra; American Jobbing Ass'n v. James, 24 Okl. 460, 103 P. 670; 49 Am.Jur., Statute of Frauds, § 321, p. 636. Cf. Bell v. Ralston Purina Company, 10 Cir., 257 F.2d 31. We must, therefore, determine as a matter of law whether the writings relied upon in this case, when measured by the standards of the foregoing rules, are sufficient to constitute a complete and binding agreement such as will satisfy the requirements of the statute of frauds.

It is readily apparent from an examination of the testimony regarding the unfound memorandum and a reading of the three letters that no one of them alone is sufficient to establish a binding contract under the statute. It is equally apparent to us that the unfound memorandum and the three letters when considered together are insufficient to constitute an existing and binding agreement such as will meet the requirements of the statute. Not only do the four documents fail to set forth all of the terms of the alleged agreement, such as the number of shares, whether such shares are to come from outstanding or unissued capital stock and the terms of payment, but they are actually inconsistent with each other. According to the evidence viewed in the light most favorable to appellee, the only thing agreed upon at the time he was employed is that he was to receive a "substantial stock option." It cannot be concluded that this is a completed contract and, in-

deed, no such contention is made. Appellee does contend as the trial court found that the unfound memorandum prepared by M. R. Shaffer establishes that he was to receive a 30% stock option and that this memorandum together with the three letters is sufficient. We do not agree for at least two reasons. First, the unfound memorandum is nothing more than the recommendations of an agent to his principal and is not a writing between the parties, that is, it is not a writing between appellee and Riceland or the Bronfmans, and considered together with the three letters fails to show a meeting of the minds or a completed agreement. In order to so find, it is necessary to rely upon the oral testimony of M. R. Shaffer, which is exactly what the statute of frauds seeks to avoid. Second, the unfound memorandum is actually inconsistent with the later letters in that nowhere in the letters is a figure of 30% mentioned, but to the contrary, a figure of 5% plus 2% is mentioned. Moreover, even as late as January 1, 1955, after the preparation of the purported memorandum, there was no agreement between the parties. The most that can be said of these writings is that they tend to show negotiations between the parties were being carried on for appellee to acquire common stock holdings in Riceland if a suitable agreement could be reached.

We conclude that even when considered together the four documents are not sufficient to establish an existing and binding agreement such as is required to satisfy the statute of frauds. To hold otherwise would frustrate the purpose of the statute.

There remains to be considered the question of part performance as found by the trial court. In this connection, appellee contended in the court below and the court found [14] that the

---

14. Finding No. 4 reads as follows:

"The verbal agreement with defendant, vesting an option in him to purchase a total of thirty per cent of the outstanding common stock of the Riceland Corporation, and to give him a valid written, en-

forceable option to that extent, was not a part of defendant's employment agreement, but was made in 1954 after defendant had accepted and commenced employment with said corporation; it was a separate and divisable oral contract and was

alleged oral agreement vesting a 30% stock option in appellee was not a part of his employment agreement but was made after he had accepted and commenced such employment and that it was a separate and divisible oral contract. In short, appellee's position was and is that there were two separate and distinct agreements between the parties, i. e., the employment agreement and the alleged oral agreement vesting a 30% stock option in him. That being the case, the performance of services under the employment agreement did not constitute a part performance of the alleged "option" agreement. In fact, the record conclusively establishes that the only consideration mentioned as to the alleged stock option was $1.00 per share. No part of such consideration was paid or tendered at any time and, therefore, there has been no part performance of the alleged agreement to take it out of the prohibition of the statute of frauds.

One other error urged by appellant that deserves our consideration is the specific finding of fraud on the part of Edgar Bronfman. Appellee did not plead fraud nor does the record show any mention of it until the trial judge, in his oral findings from the bench at the conclusion of the trial, injected it into the case. The pinning of the badge of fraud upon a person is a matter of serious concern and we fully appreciate appellant's desire to have this stigma removed. There is not a word of evidence in the case to justify such a finding. It was error for the trial judge to make such a finding.[15]

Other contentions are presented by the parties which we need not consider in view of our disposition of the case.

The judgment is reversed, and the case is remanded with directions to enter judgment in favor of appellant upon appellee's counterclaim.

supported by the executed consideration of services previously rendered and then being rendered by defendant to the Bronfman family and the Riceland Corporation, both being one and the same."

15. The finding is as follows:
"The Bronfman family, acting through Edgar Bronfman, and Edgar Bronfman himself, never intended to perform or to fully perform the oral agreement or written option with defendant. The stock option transaction was tainted with fraud of Edgar Bronfman and he was guilty of fraud from the inception of the agreement which he made and was authorized to make. He intended to use the Oklahoma Statute of Frauds and the corporations involved to perpetrate fraud."