**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 3 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

MARVIN RATNER, Trustee for
Albuquerque Motor Inn Enterprises,

      Involuntary Plaintiff,

and

PARK & SHUTTLE, INC.,

      Plaintiff-Appellee,

SOUTHWEST REALTY INVESTMENT,
INC.,

      Plaintiff-Counter-Defendant-
      Appellee,

v.

MRC PARTNERSHIP, a general
partnership; JOYCE T. BATTAGLIA and
JOHN J. BATTAGLIA, successors to Mark
Battaglia, deceased,

      Defendants-Counterclaimants-
      Third Party Plaintiffs-Appellants,

and

RICARDO CHAVES, individually and as a
partner,

      Defendant-Counterclaimant-
      Third Party Plaintiff,

v.

JOHN LORENTZEN,

      Third Party Defendant-
      Appellee.

No. 97-2001
(D.C. No. CIV-92-1419 MV)
(District of New Mexico)

## ORDER AND JUDGMENT[*]

Before **TACHA**, **BRORBY**, and **EBEL**, Circuit Judges.

Plaintiffs-appellees alleged that defendants-appellants had breached a valid, written contract to sublease an airport parking lot. The document was lost or destroyed through no fault of plaintiffs. As a result, plaintiffs introduced parol evidence during a bench trial to prove the contents of the missing agreement. The district court found that a valid agreement to sublease had been formed, ruled that defendants had breached the contract, and awarded $336,096 in compensatory damages to plaintiffs. Defendants now appeal. We affirm in part and reverse in part.

## BACKGROUND

In August of 1992, defendant-appellant MRC Partnership ("MRC") entered into an agreement (the "Ratner Lease") with Marvin Ratner ("Ratner"), Trustee for Albuquerque Motor Inn Enterprises, to lease property at the intersection of

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Yale Boulevard and Gibson Street in Albuquerque, New Mexico, located near the Albuquerque Airport (the "Yale-Gibson lot").[1] The Yale-Gibson lot is an airport parking lot containing 1,000 parking spaces (Yale Boulevard is a main thoroughfare to the airport). The Ratner Lease included an initial one-year term beginning on October 1, 1992, with the option of four annual lease term renewals, and provided for a rental rate of $240,000 per year. Importantly, MRC could exercise the option to renew the Ratner Lease at its own discretion and no approval by Ratner was required for the exercise of the option to renew. The Ratner Lease also allowed MRC to sublease the property to third parties, provided that Ratner gave his prior consent to the sublease. Ratner's consent did not need to be in writing. Defendant Ricardo (Richard) Chaves ("Ricardo Chaves"), a.k.a. Richard Chavez, Sr., acting as a disclosed agent for MRC, negotiated and executed the Ratner Lease. Ricardo Chaves is defendant Mark Battaglia's uncle. Ricardo Chaves is also the father of Richard Chaves, Jr., who, with Mark Battaglia, was a partner of MRC at the time – making Richard Chaves, Jr., and Mark Battaglia cousins.[2]

---

[1] Because this case involves an appeal from a judgment rendered after trial, we view the evidence in the light most favorable to plaintiffs as the prevailing party.

[2] The plaintiffs sued Ricardo Chaves both individually and as a partner of MRC, assuming that he was in fact a partner of MRC. However, the district court found that Ricardo Chaves was not actually a partner in MRC. In fact, Richard

(continued...)

Ricardo Chaves has five siblings of note: Frank Chavez, Ben Chavez, Sr.,[3] Eloy Chavez, Manuel Chavez,[4] and Avelina Battaglia (her married name), all of whom reside in Albuquerque. Avelina Battaglia is the mother of Mark Battaglia. Manuel Chavez is the principal of plaintiff-appellee Chavez Properties, which owns and operates the Airport Fast Park parking lot, also located on Yale Boulevard.

In September of 1992, following the execution of the Ratner Lease for the Yale-Gibson lot but before the lease term commenced on October 1, 1992, Ricardo Chaves began a series of conversations with the principals of two competing airport parking lots on Yale Boulevard. The two principals were Manuel Chavez of Chavez Properties and John Lorentzen ("Lorentzen"), the owner-operator of both plaintiffs-appellees Southwest Realty Investment, Inc. ("Southwest Realty"), and Park & Shuttle, Inc. ("Park & Shuttle").[5] Southwest Realty operates the Park & Shuttle airport parking lot. Both defendant-appellant

_____

[2](...continued)
Chaves, Jr., Ricardo Chaves' son, was a limited partner of MRC. The confusion obviously stems from the fact that Ricardo Chaves does not regularly use the "Sr." designation after his name and does not like to be distinguished from his son by the use of either "Sr." for him or "Jr." for his son.

[3] Ben Chavez, Sr.'s son acted as an attorney for the defendants at trial.

[4] Ricardo Chaves spells his last name with an "s" instead of a "z."

[5] Lorentzen is not a member of the Chavez family.

MRC and plaintiffs-appellees Southwest Realty and Park & Shuttle (the "plaintiffs") hotly dispute the substance of these discussions, and the trial centered on the question of whether the conversations resulted in the execution of a sublease for the Yale-Gibson lot.

Both Lorentzen and Manuel Chavez were interested in keeping MRC from competing with their respective companies in the airport parking lot business. As a result, Manuel Chavez and Lorentzen discussed with Ricardo Chaves the possibility of either entering into a non-compete agreement whereby MRC would be paid not to operate an airport parking lot or entering into a sublease agreement whereby Lorentzen and Manuel Chavez would sublease the Yale-Gibson lot from MRC. During the course of the negotiations, Lorentzen informed all of the parties involved, including the Chavez siblings, that an agreement not to compete would be unenforceable under New Mexico law. Also during the negotiations, Ricardo Chaves delivered to Lorentzen's attorney a copy of the Ratner Lease.

Because the parties believed that legally they could not enter into a valid non-compete contract, attention focused on negotiating a sublease for the Yale-Gibson lot. Throughout the negotiations, Lorentzen and Manuel Chavez believed that Ricardo Chaves had the authority to bind MRC to any agreement reached. The parties agreed that MRC could make a profit of $300,000 over five years simply by subleasing the Yale-Gibson lot to the plaintiffs. Manuel Chavez's and

Ricardo Chaves' siblings agreed with Manuel Chavez that the two brothers should not compete with each other and held a meeting to resolve the situation on September 13, 1992 (the "September meeting"). Lorentzen was not present at the September meeting.

At one point during the September meeting, the Chavez siblings asked Manuel and Ricardo to leave the room. After discussing possible solutions, the siblings recalled the brothers to the room. Avelina, their sister, then read aloud the family's recommendation on resolving the situation which had been handwritten on a piece of paper. Both Manuel and Richard signed this written memorandum (the "original memorandum") at the September meeting reflecting the material terms of the agreement to sublease the Yale-Gibson lot. Specifically, the memorandum noted that (1) the agreement involved a sublease; (2) Southwest Realty and Chavez Properties would pay MRC $25,000 a month in rent; (3) the property covered by the sublease was the parking lot located at the corner of Yale Boulevard and Gibson Street; and (4) the sublease covered the entire five-year term of the Ratner Lease including the renewal options. At trial, none of the parties could produce the original memorandum, which had been kept by Avelina Battaglia. The parties also signed a second, confirmatory memorandum (the

"second memorandum") at the meeting which memorialized the material terms of the original memorandum.[6]

The district court found that when Manuel Chavez and Ricardo Chaves signed the original memorandum at the September meeting, Ricardo Chaves agreed to sublease the premises jointly to both Chavez Properties and Southwest Realty even though Lorentzen was not present. The record reveals that Lorentzen and Manuel Chavez had agreed that any arrangement consummated with MRC by either Lorentzen or Manuel Chavez would be split between Park & Shuttle and Chavez Properties with 40 percent for Park & Shuttle and 60 percent for Chavez Properties. The district court also found that Ricardo Chaves knew that he was negotiating with both Manuel Chavez and Lorentzen to sublease the property. Specifically, in its May 10, 1996 order, the district court found that:

> John Lorentzen, Southwest Realty Investment and Park & Shuttle were parties to the missing agreement of September 13, 1992. Richard Chaves, Sr. met with John Lorentzen several times to negotiate the sublease of the lot which indicates that Defendants knew Southwest Realty and Park & Shuttle were parties to the contract and further that the parties intended for Park & Shuttle to use the lot to expand its business. The evidence supports a finding that Defendants were well aware that Chaves [sic] Properties and John Lorentzen, acting on behalf of Southwest Realty and Park & Shuttle, were involved in a joint venture to sublease the Yale/Gibson

---

[6] The second memorandum, signed by four of the Chavez brothers, stated, "Sunday, Sept. 13, 1992: Manuel the agreement you and Richard signed today. You will pay $25,000 per month for the parking lot that Richard is renting at Yale & Gibson. The agreement was signed by all five brothers and Avelina."

lot. I also find that Manuel Chaves had the authority to execute the September 13, 1992 Agreement on behalf of Southwest Realty and Park & Shuttle. <u>Alternatively, I find that Park & Shuttle was a third party beneficiary to the contract in question</u>.

(emphasis added). The district court also found that Ratner indicated his consent to the sublease.

Following the meeting, the plaintiffs paid MRC $20,000 in September of 1992 as consideration for the sublease. Lorentzen delivered a cashier's check for $8,000 made out to MRC, reflecting its 40 percent share of $20,000. The check included a typewritten indication on its face that read: "Yale & Gibson Rent-Sept. 1992." Chavez Properties also delivered a cashier's check for $12,000 to MRC equal to 60 percent of $20,000, but the check did not bear any notation. MRC received and accepted both checks.

Lorentzen's attorney also mailed to Ricardo Chaves a typewritten sublease agreement, complete with standard commercial lease provisions. Ricardo Chaves refused to sign this typewritten agreement and refused to honor the agreement to sublease, and in December of 1992, MRC began operating its own airport parking lot at the Yale-Gibson lot. On December 15, 1992, Chavez Properties and Southwest Realty brought suit for breach of contract against MRC and against Richard Chavez and Mark Battaglia, both in their individual capacities and in their putative roles as partners of MRC. The suit was filed in the United States District Court for the District of New Mexico under diversity jurisdiction. The

plaintiffs sought declaratory, injunctive, and monetary relief, including actual and punitive damages. The complaint also named Marvin Ratner, Trustee for Albuquerque Motor Inn Enterprises (the original lessor of the property), as an involuntary plaintiff. The plaintiffs dismissed Ratner from the action when the Yale-Gibson lot was subsequently sold to Richard Chaves, Jr., who remains the current owner of the property.[7]

The defendants filed answers denying the existence of an agreement to sublease and asserting the Statute of Frauds as an affirmative defense. The defendants also filed a third-party counterclaim against Southwest Realty and against Lorentzen alleging intentional or negligent misrepresentation. The plaintiffs then sought and were granted leave by the court to add Parking Company of America and Park & Shuttle as plaintiffs.

The district court bifurcated the trial on the breach of contract claim by first considering the issue of liability and second considering the issue of damages. Due to the withdrawal and dismissal of various claims, the only claims to be decided by the district court were Southwest Realty's and Park & Shuttle's

---

[7] On February 18, 1993, Richard Chaves, Jr., transferred his partnership interest in MRC to Mark Battaglia.

actions for declaratory judgment and breach of contract against defendants MRC and Mark Battaglia.[8]

After a bench trial, the district court concluded that (1) Ricardo Chaves acted as the apparent or authorized agent of MRC for the purposes of entering into a sublease for the Yale-Gibson lot and (2) the original memorandum was a valid contract to sublease that satisfied the requirements of the Statute of Frauds. As a result, the district court ruled that MRC and Mark Battaglia breached the agreement and were liable to the plaintiffs for damages. At the damages phase of the trial, the district awarded $1.00 in nominal damages to Southwest Realty because it had suffered no loss and $336,096 in compensatory damages to Park & Shuttle after calculating the total revenue lost to Park & Shuttle from the inability to use the Yale-Gibson lot and then deducting the amount of rent and overhead costs the plaintiffs would have paid under the sublease.

On May 20, 1996, the defendants moved to amend the judgment under Federal Rule of Civil Procedure 59(e) on the grounds that the district court improperly relied on hearsay evidence to determine that Ratner would have approved the sublease and on the basis of an affidavit from Ratner submitted with the motion to amend indicating that he would not have approved the sublease.

---

[8] Mark Battaglia is now deceased. He is now represented by his successors-in-interest, Joyce Battaglia and John Battaglia, Co-Trustees of the Battaglia Family Revocable Trust.

The district court denied the motion in an order dated November 25, 1996. This appeal followed.

## DISCUSSION

### Jurisdiction

The district court had jurisdiction under 28 U.S.C. § 1332(a)(1) (diversity jurisdiction). We have jurisdiction under 28 U.S.C. § 1291 and Fed. R. App. P. 4(a).

Because this is a diversity case, we apply the forum state's choice of law rules. See Trierweiler v. Croxton & Trench Holding Corp., 90 F.3d 1523, 1532 (10th Cir. 1996). New Mexico choice of law rules designate the place of contracting as the applicable law in considering the meaning and validity of contracts. See Tucker v. R.A. Hanson Co., 956 F.2d 215, 217 (10th Cir. 1992). As a result, New Mexico substantive law applies.

First, the defendants argue on appeal that no valid contract existed under New Mexico law because the missing original memorandum did not contain essential terms and the parties did not reach a meeting of the minds. Second, the defendants also argue that the plaintiffs did not prove by clear and convincing evidence that the missing original memorandum satisfied the Statute of Frauds.

- 11 -

Finally, the defendants contest the district court's damage award. We reject each of these contentions.

## I. Contract Formation

Under New Mexico law, the question of whether a contract has been formed is a question of fact. See Stites v. Yelverton, 289 P.2d 628, 630 (N.M. 1955); Balboa Constr. Co., Inc. v. Golden, 639 P.2d 586, 590 (N.M. Ct. App. 1981). We review a district court's factual findings for clear error. See O'Connor v. R.F. Lafferty & Co., Inc., 965 F.2d 893, 901 (10th Cir. 1992); see also Bancamerica Commercial Corp. v. Mosher Steel of Kansas, Inc., 100 F.3d 792, 803 (10th Cir. 1996).[9] "A finding of fact is not clearly erroneous unless it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made." Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d 1182,

---

[9] The defendants argue that the existence of a valid sublease constitutes a mixed question of law and fact and that we should review legal questions under a de novo standard. However, we generally review questions of contract formation as questions of fact subject to clear error review. See, e.g., Frymire v. Ampex Corp., 61 F.3d 757, 769 (10th Cir. 1995) ("[T]he issue of whether the parties have entered into a contract is a question of fact under Colorado law."), cert. dismissed, 116 S. Ct. 1588 (1996). In addition, we review mixed questions of law and fact under a clearly erroneous standard when "the mixed question involves primarily a factual inquiry." Armstrong v. Commissioner of Internal Revenue, 15 F.3d 970, 973 (10th Cir. 1994); see also Frymire, 61 F.3d at 769 (suggesting that determination of the existence of a contract is primarily a factual question subject to clearly erroneous review).

1185 (10th Cir. 1990) (quotation omitted). The defendants-appellants argue that the district court erred in finding an agreement to sublease on two grounds. First, the defendants contend that the district court erred by finding a meeting of the minds necessary to form a contract. Second, the defendants challenge the district court's conclusion that the agreement contained the essential terms necessary to constitute a valid sublease.

## A. Meeting of the Minds

Under New Mexico law, both parties to an agreement must arrive at a mutual understanding or have a meeting of the minds in order to form a valid contract. See Trujillo v. Glen Falls Ins. Co., 540 P.2d 209, 210 (N.M. 1975). The defendants argue that because the testimony on the question of whether the parties in this case were negotiating a sublease or a covenant not to compete was "diametrically conflicting," the district court necessarily erred by finding that the parties reached a meeting of the minds. The defendants cite to a number of places in the record containing testimony to the effect that the parties were negotiating a covenant not to compete and that no agreement on a sublease was ever reached, specifically the testimony of Mark Battaglia and Ricardo Chaves. The defendants also argue that the district court must have clearly erred by finding that the sublease covered a five-year term because the Ratner Lease itself was only for a

one-year term, albeit with an option to renew for four additional years.[10]  As a result, the defendants contend that the district court improperly imposed an agreement on the parties that did not in fact exist.

The defendants misconstrue the purpose of appellate review by asking us to reevaluate the evidence and reject the district court's credibility determinations. The district court quite clearly stated that a key question in the case was the credibility of various witnesses and that it found the plaintiffs' witnesses to be credible.  "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, <u>and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses</u>."  Fed. R. Civ. P. 52(a) (emphasis added); <u>see</u> <u>Salve Regina College v. Russell</u>, 499 U.S. 225, 233 (1991) (Rule 52(a) sets the standard governing appellate review of a district court's factual findings).

Although the record is replete with what the appellants describe as "diametrically conflicting" testimony, there is substantial evidence that the parties were negotiating a sublease and that the September meeting resulted in an

---

[10]  The defendants also criticize the district court for finding that rent on the Ratner Lease was calculated at $20,000 per month because the Ratner Lease clearly states that the rent had to be paid on a yearly basis at $240,000.  However, this is a minor point and is not material to the district court's other findings.  In addition, the $20,000 figure simply represents the cost per month to MRC of renting the Yale-Gibson lot and is used by the district court to show how MRC would profit by subleasing the property to the plaintiffs at $25,000 per month.

agreement on the terms of the sublease.  Given the district court's credibility determinations, this evidence supports a finding that the parties reached a meeting of the minds on the issue of the sublease.  In addition, even though the Ratner Lease only covered an initial one-year term, it gave MRC the ability to renew the Ratner Lease at its own discretion without requiring Ratner's approval.  The sublease prepared by Lorentzen's attorney specifically obligates MRC under the provision regarding "Term and Rent" to "take care of all existing conditions for purposes of the options contained in the Lease by and between Marvin L. Ratner, Trustee, as Lessor, and MRC Partnership, Lessee."  As a result, the district court did not clearly err by finding an agreement to sublease covering a five-year term, because the agreement could have bound MRC by implication to exercise its renewal options in the Ratner Lease.

Finally, the defendants argue that the parties did not reach a meeting of the minds because the sublease prepared by Lorentzen's counsel did not match the material terms of the purported agreement to sublease represented by the original memorandum signed at the September meeting.  However, the typewritten sublease agreement contains all of the same material terms included in the original memorandum as found by the district court.  The additional terms included in the typewritten sublease merely reproduce the same language included in the Ratner Lease.

## B.  Essential Terms

Under New Mexico law, a valid lease agreement must contain the following essential terms:  (1) the parties to the lease; (2) the lease premises; (3) a "definite term, its beginning and ending fixed"; and (4) the amount of rent and terms of payment.  First Nat'l Bank v. Tanney, 178 P.2d 581, 582 (N.M. 1947).  The district court found that the parties agreed to the following terms of the sublease: (1) Manuel Chavez and Ricardo Chaves signed an agreement; (2) the agreement involved a sublease; (3) the agreement covered Chavez Properties, Southwest Realty, and MRC; (4) Southwest Realty and Chavez Properties would pay MRC $25,000 a month in rent; (5) the property covered by the sublease was the parking lot located at the corner of Yale Boulevard and Gibson Street; and (6) the sublease covered the entire five-year renewable term of the Ratner Lease.

The defendants challenge the validity of the agreement to sublease on three grounds under general contract law.  First, the defendants argue that because no evidence was presented that the original memorandum mentioned either Lorentzen, Southwest Realty, or Park & Shuttle specifically by name, the agreement to sublease lacked an essential term regarding the identity of the parties and cannot be enforced by Southwest Realty or Park & Shuttle against MRC.  However, the defendants do not contest the district court's May 10, 1996, order making additional findings of fact where the district court found that Park

& Shuttle was a third party beneficiary of the contract. Under New Mexico law, third party beneficiaries to a contract can sue to recover damages for breach of the contract. See Bank of New Mexico v. Rice, 429 P.2d 368, 373 (N.M. 1967); Hoge v. Farmers Market & Supply Co., 296 P.2d 476, 479 (N.M. 1956). In addition, a third party beneficiary need not be named in a contract in order to sue under the contract. See Hamill v. Maryland Cas. Co., 209 F.2d 338, 340 (10th Cir. 1954) ("New Mexico . . . recognizes the now well established rule to the effect that a third party may sue and recover upon a valid contract in which he has a beneficial interest, whether designated therein as a beneficiary or not.").[11]

Second, the defendants argue that because the district court did not find that the original memorandum included a specific commencement date, the sublease is unenforceable under New Mexico law. See Greer v. Stanolind Oil & Gas Co., 200 F.2d 920, 922 (10th Cir. 1952) (contracts should have a definite ascertainable date of commencement and termination to be enforceable, but court can resort to "extraneous facts" to determine commencement date if the contract itself creates a patent ambiguity). However, the district court found that the sublease was to cover the entire five-year duration of the Ratner Lease. In

---

[11] Although plaintiffs-appellees Southwest Realty and Park & Shuttle did not raise this argument on appeal, we still may "affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law." United States v. Sandoval, 29 F.3d 537, 542 n.6 (10th Cir. 1994) (quotation omitted).

addition, in its May 10, 1996 ruling on the issue of damages, the district court found that the sublease would commence on October 1, 1992, and expire five years later, tracking the exact commencement and termination dates of the renewable Ratner Lease.

Third, the defendants contend that the district court did not find that Ratner actually approved the sublease as required by the Ratner Lease, and thus the sublease was unenforceable when signed. The Ratner Lease states that the "Lessee shall not . . . sublet the leased premises, in whole or in part, without the prior consent of Lessor, which consent shall not be unreasonably withheld." The district court found that Lorentzen "spoke with Marvin Ratner and that Mr. Ratner indicated that he would approve the sublease."[12] The defendants attempt to make much out of the district court's phrasing of its finding by arguing that because the district court only found that "Mr. Ratner indicated that he would approve" the sublease and not that he did approve the sublease, the agreement to sublease was

---

[12] The defendants objected to the introduction of this evidence below on hearsay grounds. However, the district court in a lengthy, well-reasoned order admitted the evidence concluding that the defendants waived their hearsay objection by asking Lorentzen about the subject during their cross-examination. The defendants do not appeal the district court's ruling on this issue. Thus, we need not address the question of whether the district court properly considered this evidence. The defendants also attempted to introduce into evidence an affidavit by Ratner stating that he would not have approved the sublease. However, the district court excluded the affidavit on the grounds of tardiness and delay, and the defendants do not now appeal that ruling either.

unenforceable.  The district court clearly understood that Ratner's approval was required to make the sublease effective.  Lorentzen testified that he requested and received approval of the sublease from Ratner, and the district court found Lorentzen's testimony on this point credible.  The sublease prepared by Lorentzen's counsel specifically states, "It is further understood that the Lessor, Marvin L. Ratner, Trustee, of the Lease . . . will approve this Sublease."  In addition, the Ratner Lease indicates that Ratner's approval would not be withheld unreasonably.  Given Lorentzen's testimony, there is no reason to believe that even if Ratner had not already approved the sublease, that he not would do so if asked.  Technically, because the original memorandum constituted an agreement to sublease, and not the actual sublease itself, Ratner's approval was not required until the actual sublease was to be signed.  MRC renounced the sublease prior to its effective term, and consequently Ratner's approval was not sought after MRC's renunciation.  Therefore, the district court's finding is sufficient to support a conclusion that the condition precedent of Ratner's approval was met.

## II.  Statute of Frauds

New Mexico has adopted the English Statute of Frauds as part of the common law.  See Ades v. Supreme Lodge Order of Ahepa, 181 P.2d 161, 165 (N.M. 1947); Sanchez v. Martinez, 653 P.2d 897, 900 (N.M. Ct. App. 1982).  The determination of whether a contract satisfies the Statute of Frauds is a legal

question under state law, see Sanchez, 653 P.2d at 900; Joseph E. Seagram & Sons, Inc. v. Shaffer, 310 F.2d 668, 675 (10th Cir. 1962), and thus is subject to de novo review, see Salve Regina College, 499 U.S. at 231 (district court rulings on state-law issues are reviewed de novo).

The Statute of Frauds covers agreements to lease real property. See Samuel Williston, A Treatise on the Law of Contracts, § 449, at 347 (1960); 1 Restatement (Second) of Property, Landlord & Tenant § 2.5 (1977). In order for a lease to satisfy the Statute of Frauds, the lease must be evidenced by a writing which (1) identifies the parties; (2) identifies the premises; (3) specifies the duration of the lease; (4) states the rents to be paid; and (5) is signed by the party to be charged. See 1 Restatement (Second) of Property, Landlord & Tenant § 2.2. A contract for the sale or leasing of land may be oral, provided it is evidenced by a writing that contains these essential terms. See Pitek v. McGuire, 184 P.2d 647, 653 (N.M. 1947). The defendants contend that the writing relied upon by the plaintiffs to constitute the sublease fails to meet the first four of these requirements under the Statute of Frauds.[13]

As an initial matter, the defendants claim that the district court improperly considered parol evidence to establish the existence of the sublease in violation of

---

[13] The defendants do not argue that Ricardo Chaves lacked authority as an agent to bind MRC to the sublease.

the Statute of Frauds.  See Seagram & Sons, 310 F.2d at 674 (writing required by Statute of Frauds "must leave nothing to rest in parol").  The defendants also argue that the second memorandum is insufficient to show a valid lease satisfying the Statute of Frauds.  However, the second memorandum is only evidence of the original memorandum, and it is the original memorandum that the court found constituted a valid sublease.  Moreover, "[i]f the requirements of the statute of frauds are satisfied by a signed contract or memorandum, the contract remains enforceable even though the writing is lost or destroyed.  The contents of the writing can then be proved by parol testimony and the contract enforced."  4 Caroline N. Brown, Corbin on Contracts, § 23.10, at 827 (Joseph M. Perillo, ed., rev. ed. 1997) (citing cases).  Nevertheless, a plaintiff must prove the terms of a written contract that has been lost or destroyed by clear and convincing evidence to satisfy the Statute of Frauds.  See Crawford v. 733 San Mateo Co., 854 F.2d 1220, 1221 (10th Cir. 1988) (applying New Mexico law regarding lost instruments); Brown, supra, § 23.10, at 828 (citing cases).

### A.  Identification of Parties

Citing Ades, 181 P.2d at 166, the defendants argue that the agreement to sublease is unenforceable under the Statute of Frauds because the court found that neither Lorentzen, Southwest Realty, nor Park & Shuttle were listed as parties in the original memorandum that constituted the sublease.  In Ades, the New Mexico

- 21 -

Supreme Court held that a contract involving land signed by an agent fails to satisfy the Statute of Frauds where the agent does not disclose the principal for whom the agent acts. Thus, the defendants contend that because the original memorandum did not disclose the principal for whom Manuel Chavez acted as an agent, the agreement fails to describe plaintiffs Southwest Realty and Park & Shuttle sufficiently to satisfy the Statute of Frauds.

We do not believe that Ades requires us to reverse the ruling in Park & Shuttle's favor, given the district court's finding that Park & Shuttle was a third party beneficiary of the contract. Although New Mexico courts have not addressed the issue, it is generally recognized that the Statute of Frauds does not require a third party beneficiary to have signed or be named in a contract in order to maintain a cause of action under the contract. See, e.g., Coleman v. Mountain Mesa Uranium Corp., 240 F.2d 12, 16 (10th Cir. 1956); see also 72 Am. Jur. 2d Statute of Frauds § 364 (1974) ("[W]here a contract is signed by the parties to it, there is no requirement of the statute of frauds that a third party beneficiary also sign the contract."). Because the defendants do not appeal the district court's ruling that Park & Shuttle was a third party beneficiary, we may affirm the district court's ruling enforcing the contract against MRC in favor of Park & Shuttle, despite the Statute of Frauds question.

However, the district court did not find that Southwest Realty was a third party beneficiary of the contract. Consequently, under Ades it was necessary for the original memorandum to identify Southwest Realty as a party or identify Manuel Chavez as an agent of Southwest Realty. See Ades, 181 P.2d at 166 (agent of a party to a lease must be described as an agent in writing to meet the Statute of Frauds under New Mexico law). Modern treatises seem to have rejected the strict agency disclosure rule set forth in Ades. See 1 Restatement (Second) of Property, Landlord & Tenant § 2.2, cmt. b. Nevertheless, we feel bound to follow the clear precedent established by the New Mexico Supreme Court in Ades. As a result, the district court erred by allowing Southwest Realty to enforce the sublease against MRC, because no clear and convincing evidence was presented that Southwest Realty was named in the original memorandum or that the original memorandum identified Manuel Chavez as an agent for Southwest Realty. For this reason, we reverse the judgment and award of nominal damages in favor of Southwest Realty.

## B. Description of Premises

The defendants contend that the description in the original memorandum of the property to be subleased – as found by the district court to be the Yale-Gibson lot leased by MRC – did not identify the property adequately to satisfy the Statute of Frauds. "Generally speaking, a memorandum in writing meets the

requirements of the statute of frauds . . . if it contains . . . a description of the property sufficient to render it capable of identification." Pitek, 184 P.2d at 652 (quotation omitted); see also Rhodes v. Wilkins, 498 P.2d 311, 313 (N.M. 1972) ("A written memorandum must contain a sufficient description of the land, or furnish the means or data within itself which points to evidence that will identify it.") (quotation omitted). The description of the property found by the district court to be in the original memorandum leaves no doubt as to what property the parties intended to sublease. See John C. Williams, Annotation, Requirements as to Certainty and Completeness of Terms of Lease in Agreement to Lease, 85 A.L.R.3d 414 § 6(a) (1978) (citing cases). The cases cited by the defendants in support of their position involved situations unlike this one where the court invalidated contracts for the sale of land because the property could not be identified at all from the written description. See Rhodes, 498 P.2d at 313 (contract describing land to be sold as "approximately 1.862 acres within a ten acre tract" insufficiently identified specific property to be conveyed); Pitek, 184 P.2d at 652 (description of premises to be purchased as "property on E. Central Ave." inadequate to identify property where seller owned six contiguous lots fronting East Central Avenue).

## C. Duration of the Sublease

The defendants argue that the sublease did not provide for a definite term and duration of the sublease and thus violated the Statute of Frauds. Manuel Chavez testified at trial that the handwritten document containing the family's recommendation stated, "that we [Lorentzen and Manuel Chavez] would rent the lease for five years, pay them $25,000" per month (emphasis added). Manuel Chavez also testified that he understood that the sublease would start on "October 1" of 1992, the same day that the Ratner Lease would commence. Further, Manuel Chavez testified that the "sublease was to be--reflect what the original lease was, just an assignment. In other words, we would take their position." (emphasis added). Finally, Manuel Chavez was asked, "And to your knowledge, did it [the document] cover anything other than the identification of the property at issue, the amount to be paid per month, and the duration of the lease?" (emphasis added). Manuel Chavez responded, "No, nothing else."[14]

---

[14] In addition, Manuel Chavez stated in an affidavit filed with court on December 31, 1992:

> Ricardo Chavez subsequently signed an agreement to lease the premises to my partnership and Southwest Realty Investment, Inc. for a period of five (5) years to commence October 1, 1992, at a price of $25,000 per month.

It is unclear whether this affidavit was submitted as evidence during trial. However, because we find the testimony presented at trial sufficient to affirm the district court's ruling, we need not address the question of whether the district court properly could have relied on the affidavit as support for its factual

We agree with the defendants that the record does not establish by clear and convincing evidence that the original memorandum underlineexpressly provided for a start date of October 1, 1992 for the sublease.[15] We also agree that a plaintiff must show that a written document creating a lease for longer than one year includes a fixed beginning and ending date in order satisfy the Statute of Frauds under New Mexico law. See Tanney, 178 P.2d at 582. Nevertheless, we do not find that a document creating a sublease expressly must state a beginning and ending date when the document makes clear that the sublease covers the entirety of the term of the original lease and when the original lease is available and includes a clear beginning and ending date. Here, the defendants do not dispute the fact that the Ratner Lease was to begin on October 1, 1992. Manuel Chavez testified that the document stated that the sublease was for a term of five years and that the sublease would cover the entire term of the Ratner Lease. We find such testimony, in conjunction with the substantial amount of corroborating evidence to the effect that the agreement constituted a five-year sublease, sufficient to

_____

[14](...continued)
findings.

[15] Manuel Chavez's testimony that it was his understanding that the sublease would commence on October 1, 1992, is not clear and convincing evidence, on its own, to show that the document itself explicitly stated that the sublease would begin on that date.

- 26 -

qualify as clear and convincing evidence that the original memorandum satisfied the Statute of Frauds.

## D. Payment of Rent

The defendants also claim that the sublease does not meet the Statute of Frauds because it fails to provide for the manner and time for the payment of rent, citing Smith v. House of Kenton Corp., 209 S.E.2d 397, 400 (N.C. Ct. App. 1974) (lease did not satisfy Statute of Frauds because it failed to provide for the manner of payment of rent, whether monthly, quarterly, semiannually, or whether due at the first of the month, mid-month, or at the end of the month). Smith has not been adopted by New Mexico courts. We believe that New Mexico law comports with the position that providing for the amount of rent and the period to be covered by the rental amount (i.e. monthly rent or annual rent) is sufficient to satisfy the Statute of Frauds. Thus, we find the original memorandum to be sufficiently clear on the question of rent to satisfy the Statute of Frauds.

## III. Damages

We review a damage award under the clearly erroneous standard. See Brown v. Presbyterian Healthcare Servs., 101 F.3d 1324, 1330 (10th Cir. 1996), cert. denied, 117 S. Ct. 1461 (1997). The district court awarded $336,096 in compensatory damages to Park & Shuttle for lost profits. The district court first calculated the actual lost revenue to Park & Shuttle resulting from MRC's

operation of a competing airport parking lot by subtracting the amount of revenue earned each year by Park & Shuttle in 1993, 1994, and 1995 from the amount of revenue earned in 1992.  The district court then increased that figure by the percentage increase in in-plane passengers at the Albuquerque Airport for those years, arriving at a figure of $695,078.  The district court next calculated Park & Shuttle's losses for 1996 and 1997 in the same way, but reduced the loss amount to reflect the overall trend of decreasing losses from 1993 to 1995, arriving at a figure of $361,018.  The district court then subtracted from the sum of those two loss figures, which totaled $1,056,096 in lost revenue, Park & Shuttle's estimated expenses to operate a parking lot at the Yale-Gibson lot, including rent at $25,000 per month and overhead such as security and insurance at $2,000 per month, or $720,000 in total expenses, arriving at a lost profit figure of $336,096 ($1,056,096 minus $720,000 equals $336,096).

The defendants contend that because the original memorandum was only an agreement to sublease and not an actual sublease and because the second memorandum does not provide for the duration of the sublease, the plaintiffs should only recover the $8,000 sum that Southwest Realty paid defendant MRC as consideration for the agreement.  The defendants' position is untenable.  First, the original memorandum constituted the agreement, the second memorandum only served as evidence of the original, and the original memorandum included a five-

year term. If it did not, then it would have lacked an essential term and would not qualify as an agreement to sublease in the first place, and any damages for breach of an unenforceable contract would be inappropriate. Thus, the district court properly awarded damages based on a five-year period.

Second, not only is a lessee entitled to recover the difference between the rent agreed upon and the actual rental value of the property for a lessor's breach of an agreement to lease, see Pennsylvania State Shopping Plazas, Inc. v. Olive, 120 S.E.2d 372, 377 (Va. 1961), a lessee is also entitled to recover damages for losses, including lost profits, which were the direct, natural, and necessary consequences of the breach and which were within the contemplation of the parties when the agreement was made, see 49 Am. Jur. 2d Landlord and Tenant § 16 (1995). "[W]here profit is an inducement to making a contract, loss of profits as a result of the breach is generally considered to be within the contemplation of the parties . . . ." Camino Real Mobile Home Park Partnership v. Wolfe, 891 P.2d 1190, 1197 (N.M. 1995). A plaintiff may recover damages for lost profits resulting from breach of contract to lease provided that "the amount of lost profits is ascertainable with reasonable certainty." 49 Am. Jur. 2d Landlord and Tenant § 16 (1995); see Camino Real, 891 P.2d at 1197. Here, the district court based its damage award on credible, detailed accounting figures presented

by Lorentzen.  Thus, the district court did not clearly err in its calculation and award of damages.

The district court also awarded nominal damages to Southwest Realty for breach of contract because it could not show any loss as a result of the breach. The defendants challenge the nominal damage award by arguing that the district court erred by finding breach of contract.  Because Southwest Realty cannot enforce the sublease against MRC under the Statute of Frauds, we reverse this award.

## CONCLUSION

For the reasons discussed above, we AFFIRM the judgment of the district court, but REVERSE the judgment in favor of Southwest Realty and the award of nominal damages to Southwest Realty.

ENTERED FOR THE COURT

David M. Ebel
Circuit Judge